# United States District Court
## for the Northern District of Oklahoma

Case No. 22-cv-365-JDR-JFJ

Courtney Goff,

*Plaintiff*,

*versus*

BOKF, NA,

*Defendant*.

## OPINION AND ORDER

In October 2020, Plaintiff Courtney Goff began working as a client experience specialist in one of Defendant BOKF, NA's banking centers. Soon after, one of her co-workers, Samuel Njoku, spoke and acted in a way that made Ms. Goff uncomfortable. She expressed her concerns about Mr. Njoku's behavior to her supervisor on October 30, 2020, and she later informed Mr. Njoku that she would report her concerns to management if his conduct continued. Ms. Goff made no further complaints about Mr. Njoku until January 13, 2021. By that time, BOKF had initiated an investigation into allegations of ongoing conflict between Ms. Goff and her peers. At the conclusion of that investigation, BOKF fired Ms. Goff.

Ms. Goff claims that BOKF violated both Title VII of the Civil Rights Act of 1964 and the Oklahoma Anti-Discrimination Act by (1) subjecting her to a sexually hostile working environment, and (2) firing her in response to her decision to report Mr. Njoku's harassment in January 2021. Dkt. 2. BOKF moves for summary judgment on the federal claims, arguing that the

Case No. 22-cv-365

evidence would not permit a jury to find in Ms. Goff's favor. Dkt. 53. The Court agrees and grants BOKF's motion.

I

Before discussing the merits of BOKF's motion, the Court must address the scope of that motion. Although BOKF moved for summary judgment on the "two claims alleged" by Ms. Goff, it later suggested that those claims consisted of (1) her hostile work environment claim, and (2) her retaliation claim. Dkt. 53 at 8, 35. BOKF addressed the hostile-work environment claim separately from the retaliation claim and analyzed both claims under federal law, rather than Oklahoma law. *Id.* at 8, 31, 32, 34 (discussing claims brought under Title VII). BOKF did not discuss the OADA claims in its brief, did not identify the standard applicable to those claims, and did not suggest that the analysis governing the federal claims applied with equal force to the state-law claims.

The Court directed the parties to submit briefs addressing whether they intended or understood BOKF's motion to address the federal claims, the state claims, or both. Dkt. 77. BOKF responded that it intended to challenge both the federal and the state claims and asked the Court to resolve them together because they are "mirror images." Dkt. 79 at 1. Although the federal and state claims bear many similarities,[1] they remain different claims, and Ms. Goff has not had an opportunity to address all of them. *See* Dkt. 78 at 1-2. If BOKF intended to seek summary judgment on Ms. Goff's OADA claims, it should have clearly stated that intention. *See Seifried v. Portfolio Recovery Assocs., LLC*, No. 12-cv-0032-JHP, 2013 WL 6185478, at *6 (E.D. Okla.

---

[1] BOKF cites several cases suggesting that OADA claims and Title VII claims should be treated identically, but none is binding, and all of them can be traced back to an unpublished decision holding only that the plaintiff's Title VII claim was "barred for the same reasons" as her ***time-barred*** ADA claim. *Barzellone v. City of Tulsa*, 210 F.3d 389, 2000 WL 339213, at *3 (10th Cir. March 31, 2000) (unpublished). It is unclear that *Barzellone* supports the proposition urged by BOKF, but even if it does, Ms. Goff should have had the chance to argue otherwise.

Case No. 22-cv-365

Nov. 25, 2013). BOKF did not do so. Accordingly, this Order is limited to Ms. Goff's Title VII claims, the only claims directly addressed in BOKF's motion.

II[2]

Ms. Goff was initially hired by BOKF to work as a telephone customer service representative. Dkt. 53 at 8.[3] On October 1, 2020, she was promoted to client experience specialist, an in-branch position that required her to provide services as both a banker and a teller. *Id.* at 17 (statements of fact nos. 58, 59).[4] On October 6, 2020, she sent messages to one of her co-workers, Samuel Njoku, asking whether he had used a camera for his online training and indicating that she did not like being on camera. *Id.* at 18 (statements of fact nos. 66, 70). Mr. Njoku replied that Ms. Goff was "very presentable" and added an emoji suggesting that what he said was a secret or should be kept quiet. *Id.* at 18-19 (statement of fact no. 71). Later that day, Mr. Njoku offered to purchase a snack for Ms. Goff and appeared disappointed when she declined. Dkt. 53-141 at 70-72; Dkt. 63-4 at 5. Ms. Goff believed that, in sending the message, Mr. Njoku was "coming on" to her. Dkt. 63 at 6 (response to statements of fact nos. 72, 73).

Ms. Goff claims that Mr. Njoku engaged in other conduct that made her uncomfortable, including but not limited to: following her into a dark and empty area of the bank to confront her about liking another male employee more than him; coming to her office uninvited and positioning himself in a way that required Ms. Goff pass close by in order to leave the room; sitting in her office with his legs positioned in a way that emphasized his genitalia;

---

[2] The Court accepts the factual representations made by Ms. Goff for purposes of this order. Facts asserted by BOKF are undisputed unless otherwise noted.

[3] All citations utilize CMECF pagination.

[4] Prior to being promoted, Ms. Goff challenged a disciplinary action that was issued when she hung up on a customer. Dkt. 53 at 17 (statements of fact nos. 54-55). She continued to challenge the action after she was promoted. *Id.* (statement of fact no. 54).

leaning close to Ms. Goff's face; closely observing Ms. Goff while she was at work; acting flirty, giddy, and nervous; looking at Ms. Goff longingly with "bedroom eyes"; commenting on Ms. Goff's body and clothing; sending Ms. Goff unwanted messages; and repeatedly asking Ms. Goff why she was not "as close" to him as she was to other co-workers. Dkt. 63 at 10-11 (additional statements of fact nos. PF4 to PF8).

On October 30, 2020, Ms. Goff had lunch with her supervisor, Ashley Pratt. Dkt. 53 at 19 (statement of fact no. 73). During the lunch, Ms. Pratt asked Ms. Goff about the "issue" between Ms. Goff and Mr. Njoku. *Id.* Ms. Goff initially dismissed the question. *Id.* When pressed, however, she told Ms. Pratt about the October 6 message from Mr. Njoku. *Id.* She also told Ms. Pratt that, on at least one occasion, Mr. Njoku followed her into a dark, empty part of the bank and asked her why she liked another male employee more than she liked him. Dkt. 63 at 12 (additional statement of fact no. PF11). Ms. Pratt stated that Mr. Njoku had already told her about the message. She asked Ms. Goff to forward it to her, and Ms. Goff did so. Dkt. 53 at 19 (statement of fact no. 73).

That same day, Ms. Pratt discussed the message with both Mr. Njoku and Ms. Goff, stating that the message did "come off as flirty." Dkt. 53 at 19 (statement of fact no. 74).[5] Ms. Pratt instructed Mr. Njoku not to approach Ms. Goff personally and told Ms. Goff that she should not be so easily offended and should try to work more closely with Mr. Njoku. Dkt. 53 at 19 (statement of fact no. 74); Dkt. 53-19 (reminding Mr. Njoku that Ms. Pratt

---

[5] Although Ms. Goff disputes BOKF's statement of fact no. 74, she does not present evidence contradicting BOKF's contention that Ms. Pratt addressed the message with Mr. Njoku in Ms. Goff's presence and acknowledged that the message appeared flirtatious. Instead, she challenges the adequacy of Ms. Pratt's response and sets forth additional facts regarding what was said to Ms. Goff. Dkt. 63 at 6. Because Ms. Goff has not established the existence of a genuine dispute regarding statement of fact no. 74, the Court accepts the facts in that statement as true. The Court likewise accepts as true the additional facts supplied by Ms. Goff regarding Ms. Pratt's response.

Case No. 22-cv-365

had instructed him to email Ms. Goff instead of approaching her in person if he needed to say something to her). Dkt. 63 at 12 (additional statement of fact no. 12). Ms. Pratt considered the matter resolved, but she followed up with Ms. Goff to ask how she felt about the meeting. Dkt. 53-141 at 84-88. Ms. Goff chose not to "engage" with Ms. Pratt's follow-up correspondence because she felt Ms. Pratt was biased and had dismissed her concerns. *Id.*

On December 7, 2020, Ms. Goff emailed Mr. Njoku about his "habitual" practice of cornering her and asking why she was not close to him. Dkt. 53-141 at 73.[6] Ms. Goff told Mr. Njoku that she would contact either her supervisor, Tierra Tate,[7] or the Employee Resource Center if he continued to engage in that conduct. Dkt. 53-19. Ms. Goff did not copy her supervisor on the email or otherwise inform BOKF leadership that she had ongoing, unresolved concerns with Mr. Njoku in December 2020.

On December 15, 2020, Ms. Goff reported a disagreement with another co-worker, Iby Dick, to Ms. Tate. Dkt. 53-16. In the email, she stated that she was unable to resolve a "super minor" spat with Mr. Dick and that, when she tried to address the issue directly, Mr. Dick said she was "just trying to resist him and he didn't want to talk to [her] about it." *Id.* She expressed her opinion that Mr. Dick "thought [she] was just trying to be a brat," raised his voice and walked away from her, and "bl[e]w up" in a way that was awkward and uncomfortable. *Id.* Mr. Dick, who was copied on the email, disagreed with Ms. Goff's characterizations but apologized for making her feel upset. *Id.*

---

[6] The email does not mention Mr. Njoku's alleged practices of coming into Ms. Goff's office and blocking the exit, sitting in a provocative way, leaning close to Ms. Goff, observing her at work, looking at her longingly, or commenting on her clothes and body.

[7] Ms. Tate replaced Ms. Pratt on November 1, 2020. Ms. Pratt remained employed by BOKF, but in a different position, after that date.

Case No. 22-cv-365

On December 18, Ms. Goff informed Ms. Tate of an incident where a customer "went off" after Ms. Goff refused to accept an expired license. Dkt. 53-17. Ms. Tate shared the email with a group of employees and informed the employees that they could, in fact, accept expired identifications. *Id.* Ms. Goff responded that she was sorry she "got [the policy] incorrect." *Id.*

On December 18, 2020, Ms. Goff had a closing balance discrepancy of $100. She believed that the discrepancy was created when she sold a mutilated $100-dollar bill to Mr. Njoku. Dkt. 53-20. Mr. Njoku disagreed. *Id.* Ms. Goff left for vacation the following day. While Ms. Goff was away, Mr. Njoku forwarded her December 7 email to Ms. Tate. Dkt. 53-19. In a conversation with Ms. Tate, Mr. Njoku stated that Ms. Goff was making him uncomfortable and asked if he could begin working at another branch. Dkt. 53-144 at 4-6. Ms. Tate forwarded the email to another employee and began scheduling Ms. Goff and Mr. Njoku at different branches when staffing permitted her to do so. Dkt. 53-144 at 59. As a result of those efforts, Ms. Goff and Mr. Njoku worked together on only two occasions in January 2021. Dkt. 53 at 23 (statement of fact no. 108).

When Ms. Goff returned to work on December 28, 2020, she contacted Ms. Tate regarding the $100 shortage. Dkt. 53-20. Ms. Goff expressed her opinion that Mr. Njoku was responsible for the shortage, and asked Ms. Tate to review the footage because the "cameras don't lie." *Id.* On January 4, 2021, she made a second request for the video footage. Dkt. 53-21 at 2. A BOKF operations manager requested the video that same day. Dkt. 53-132. BOKF security personnel reviewed the video and concluded that the video matched the recorded transactions and that Ms. Goff, rather than Mr. Njoku, was responsible for the shortage. Dkt. 53-22; Dkt. 53-113.

On January 6, 2021, BOKF's consumer risk review team informed Ms. Tate that Ms. Goff had incorrectly cashed a $30.00 check for $300.00. Dkt. 53-133. In the days that followed, Ms. Tate asked the Employee Resource

6

Case No. 22-cv-365

Center to advise how she should coach Ms. Goff about the loss. *Id.* She also forwarded several documents to Amber Bell, a human resources specialist. Dkt. 53 at 10 (statement of fact no. 11); Dkt. 53-134. Those documents included the December 28 email blaming Mr. Njoku for the $100 shortage; messages between Ms. Goff and Mr. Njoku; an email accusing Mr. Njoku of being biased toward Mr. Dick; and the December 7 email from Ms. Goff to Mr. Njoku. Dkt. 53-134.

On January 11, 2021, Ms. Goff sent Ms. Tate an email concerning the December 18 correspondence regarding BOKF's policy on expired identification. Ms. Goff took issue with Ms. Tate's failure to protect Ms. Goff's anonymity. Dkt. 53-136. Ms. Goff characterized her supervisor's decision as "humiliating" and "in poor taste." *Id.* Although Ms. Goff thought Ms. Tate's motives were pure, she stated that they were "executed poorly." *Id.* Ms. Tate forwarded the email to Ms. Bell and Ali Ferguson, the manager of employee relations for BOKF. Dkt. 53-10; Dkt. 53-136.

On January 12, 2021, Ms. Tate and operations manager Summer Braswell met with Ms. Goff and informed her that the security footage confirmed that she was responsible for the $100 loss that took place on December 18th. Dkt. 53 at 10; Dkt. 53-27. Ms. Goff did not accept that conclusion, responding that, while she appreciated the attempt to give her closure, she knew "factually what [she] had in [her] drawer." Dkt. 53-27. Ms. Goff's email was forwarded to Ms. Bell and, later, to Rick McElhaney, one of BOKF's managers. Dkt. 53-27; Dkt. 53-28.

It is not clear precisely when BOKF decided to investigate the concerns by and about Ms. Goff, but the decision was made on or before January 11, 2021. *See* Dkt. 53-136 (indicating that Ms. Tate was not sure whether Ms. Bell and Ms. Ferguson wanted the email "before conducting interviews"). On January 12, 2021, BOKF opened its case file concerning the "peer conflict" and began interviewing its employees, including Mr. Njoku and Mr.

7

Case No. 22-cv-365

Dick. *See* Dkt. 63-1 at 66; Dkt. 63-7. Ms. Goff initially stated that she was not available to participate and did not "recall reaching out . . . about anything" that year. Dkt. 53-24. She agreed to participate, however, after BOKF informed her that failure to do so would be considered insubordination. Dkt. 53-25. During her interview, Ms. Goff represented that any conflict she had with Mr. Njoku had been addressed by her email, and that she had "nothing bad to say about him" at that time. Dkt. 53-26. After that meeting, Ms. Goff forwarded the December 7, 2020 email to Ms. Ferguson.

On January 21, 2021, Mr. McElhaney told Ms. Tate, Ms. Braswell, employee relations manager Ali Ferguson, human resources business partner Evan Blackhurst, and Joshua Gehring that the situation with Ms. Goff was "continuing to escalate" and could "result in the loss of some good employees" unless decisive action was taken. Dkt. 53-138. Mr. McElhaney and Ms. Braswell met with Ms. Goff the following day. Dkt. 53-29. During that meeting, Mr. McElhaney told Ms. Goff that the security video confirmed her responsibility for the $100 loss on December 18. *Id.*; Dkt. 63-2 at 9. Mr. McElhaney also addressed other concerns, and Ms. Goff responded by discussing her December 7 email and its contents. Dkt. 53-141 at 41-45; Dkt. 63-2. There is no evidence that Ms. Goff ever told Mr. McElhaney or anyone else at BOKF about any harassment or misconduct other than what was set forth in the December 7 email or reported on October 30, 2020.

After the January 21 meeting, BOKF's director of human resources, Amber Bryant, met with chief human resources officer Kelly Weil and Ali Ferguson to discuss the results of the investigation. Ms. Bryant concluded that Ms. Goff had "demonstrated an unwillingness to . . . be receptive to coaching efforts," and had "displayed issues building relationships with coworkers" in violation of BOKF standards and policies. Dkt. 53-1. For these reasons, Ms. Bryant decided to terminate Ms. Goff's employment. *Id.*; Dkt. 53-139. Ms. Goff filed a complaint with the EEOC, received a right-to-sue letter, and timely filed this lawsuit alleging that she was unlawfully subjected

8

Case No. 22-cv-365

to a hostile work environment and retaliated against for raising her concerns about Mr. Njoku's behavior. Dkt. 2.

### III

BOKF moved for summary judgment Ms. Goff's federal claims. Dkt. 53. That motion may only be granted if, when the facts are viewed and all reasonable inferences are drawn in BOKF's favor, "no genuine issues of material fact exist and [BOKF] is entitled to judgment as a matter of law." *Ford v. West*, 222 F.3d 767, 774 (10th Cir. 2000) (citing Fed. R. Civ. P. 56(c)). If Ms. Goff bears "the burden of proof at trial on a dispositive issue," then she must identify specific facts that would "establish the existence of an element essential to [her] case in order to survive summary judgment." *Id.* (citation and quotation marks omitted).

### IV

To prevail on her hostile work environment claim, Ms. Goff must first present facts that, if true, could permit a jury to find that she, a member of a protected class, was subjected to unwelcome harassment based on her sex, and that the harassment was so severe or pervasive that it had the effect of altering the conditions of her employment by creating an intimidating, hostile, or offensive working environment. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (quoting *Meritor Sav. Bank, F.S.B. v. Vinson*, 477 U.S. 57, 65 (1985)); *see Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (setting forth the elements of a hostile work environment claim). The Court assumes, for purposes of this opinion, that Ms. Goff has presented sufficient evidence to create a triable issue with respect to these elements. *See* Dkt. 63 at 12 (additional statement of fact no. PF9) (detailing behavior that caused Ms. Goff to feel uncomfortable and resulted in her taking efforts to hide her body).

But even if, as the Court assumes, Ms. Goff has established a prima facie claim for a hostile work environment, she cannot proceed to trial unless

she presents evidence that BOKF itself was responsible for that environment. *See Ford*, 222 F.3d at 775-76 (identifying grounds for holding an employer liable for a hostile work environment based upon the application of general agency principles); *Adler*, 144 F.3d at 673 (recognizing that Congress intended courts to look to general agency principles when evaluating whether an employer is responsible for sexual harassment by its employees). Ms. Goff asserts that BOKF is liable under a negligence theory because it knew about Mr. Njoku's acts of harassment by October 30, 2020, but negligently failed to take appropriate steps to remedy that harassment. Dkt. 63 at 18-19. *Ford*, 222 F.3d at 776.[8]

When determining whether BOKF may be held liable under this theory of recovery, the Court considers only the conduct that Ms. Goff actually reported. BOKF was "only obligated to respond to harassment of which it actually knew, or in the exercise of reasonable care should have known." *Adler*, 144 F.3d at 673. It had no obligation to respond to events that it was not aware of or lacked constructive notice of. When viewed in the manner most favorable to Ms. Goff, the evidence demonstrates that, as of October 30, 2020, BOKF was aware that Mr. Njoku had (1) sent Ms. Goff a flirtatious and offensive message regarding her appearance, and (2) followed Ms. Goff into a dark area of the bank and asked her about her closeness with another male co-worker. Dkt. 63 at 19. This is the only conduct that BOKF had knowledge of at that time, and the only conduct that BOKF had an obligation to address.[9]

---

[8] Although Ms. Goff argues that BOKF had "constructive notice" of the harassment, her brief focuses solely on the October 30, 2020 conversation between Ms. Goff and Ms. Pratt. Dkt. 63 at 18-20. She does not argue, nor has she presented any evidence, that Mr. Njoku's actions were so "so egregious, numerous, and concentrated" that they constituted a campaign of harassment of which BOKF should have been aware. *Ford*, 222 F.3d at 776 (quoting *Adler*, 144 F.3d at 675) (internal citation and quotation marks omitted).

[9] There is no evidence that Ms. Goff reported Mr. Njoku's other alleged misconduct, such as his practice of sitting provocatively, blocking Ms. Goff's exit from her office, visiting Ms. Goff's office unnecessarily, leaning close to Ms. Goff, looking at her longingly, or making comments and sending messages other than those referenced in Ms. Goff's brief.

Case No. 22-cv-365

Because Ms. Goff has established that BOKF had actual knowledge of two incidents of sexual harassment, the Court must consider whether a jury could find, based on the evidence of record, that BOKF responded inadequately to those incidents. *Adler*, 144 F.3d at 675. "[T]he touchstone for the evaluation of an employer's response . . . is reasonableness," and an employer may discharge its obligation to address harassment by "taking appropriate remedial or preventative [sic] action." *Id.* at 675-76. Appropriate measures are those that are "reasonably calculated to end the harassment." *Id.* at 676 (citations and internal quotation marks omitted). When an employer's response stops the harassing behavior, the effectiveness of the response is, itself, evidence that the employer's response was reasonably calculated to end the misconduct. *Adler*, 144 F.3d at 676. But such evidence is not necessary to support a finding that an employer responded reasonably. *Id.* (indicating that, because there is no strict liability, a response might be reasonably calculated to stop wrongful conduct even if the conduct continues). The reasonableness of an employer's response can also be established by evidence concerning the timeliness of the employee's disclosure, the employer's delay in responding, and the proportionality of the response—even where that response is ultimately ineffective. *Id.*

After reviewing the evidence presented in this case, the Court concludes that there is insufficient evidence to create a jury question regarding the reasonableness of BOKF's response. First, the evidence shows that Ms. Goff did not bring her concerns to BOKF in a timely manner—in fact, she tried to avoid bringing them up. It was Mr. Njoku who originally brought the allegedly offensive message to BOKF's attention, and it was Ms. Pratt who

---

*See* Dkt. 63 at 10-11 (additional statements of fact nos. PF4 to PF8). The Court "consider[s] these [events] to have occurred." *Adler*, 144 F.3d 674. Nevertheless, the Court concludes that BOKF had no obligation to respond to these other events because there is no evidence that BOKF was aware of them. *Id.* (holding that the defendant "had no obligation to respond" to incidents where the plaintiff had failed "c[o]me forward with sufficient specific facts . . . evidencing knowledge" of those incidents on the part of the defendant).

brought up the "issue" between Ms. Goff and Mr. Njoku on October 30, 2020. Dkt. 53 at 19 (statement of fact no. 73); Dkt. 63 at 6 (admitting statement of fact no. 73). Ms. Goff initially "dismissed" Ms. Pratt's inquiry and said "everything [was] okay," but Ms. Pratt persisted. Dkt. 53 at 19. Only then did Ms. Goff express her concerns about the message and her in-person confrontation with Mr. Njoku. *Id.* Ms. Pratt immediately asked Ms. Goff to forward the message to her. *Id.* It was the efforts of Mr. Njoku and Ms. Pratt, rather than Ms. Goff's initiative, that caused BOKF to become aware Ms. Goff's two concerns.

Second, BOKF's response was swift and immediate. Ms. Pratt asked Ms. Goff to send her the offensive message the same day that she learned of Ms. Goff's concerns. *Id.* She acknowledged that the text sounded flirtatious and instructed Mr. Njoku that he should email Ms. Goff, rather than approaching her in person, to discuss personal issues. Dkt. 53 at 19 (statement of fact no. 74); Dkt. 53-19. And although Ms. Pratt considered the matter resolved, she followed up with Ms. Goff and asked whether she felt the meeting went well. Ms. Goff elected not to engage with Ms. Pratt's attempts to "get a temperature check" on the situation. Dkt. 53 at 19 (statement of fact no. 75); Dkt. 53-141 at 87-88. The evidence shows that BOKF promptly responded to Ms. Goff's concerns and then attempted (albeit unsuccessfully) to follow up with Ms. Goff regarding the matter. This demonstrates the reasonableness of BOKF's response and fails to lend support for Ms. Goff's claim that BOKF negligently failed to address Mr. Njoku's conduct toward her. *See Adler*, 144 F.3d at 677 (affirming summary judgment where there was no evidence of delay, the response was prompt, and the employer "began asking [the plaintiff] periodically whether she was experiencing any problems").

Third, the undisputed evidence demonstrates that BOKF's response was proportionate to both the seriousness and frequency of the concerns raised by Ms. Goff. *See Adler*, 144 F.3d at 676. Only two instances of harassment were reported to Ms. Pratt, and there is evidence that Ms. Goff

considered those events to be minor and not worth addressing. *See* Dkt. 53 at 19 (indicating that everything was "okay" with Mr. Njoku); Dkt. 53-19 (criticizing Mr. Njoku for going to Ms. Pratt about "these small matters, more than once"). Nevertheless, Ms. Pratt validated Ms. Goff's position when she told Mr. Njoku that his message came off as flirtatious, and she addressed Ms. Goff's other concern by instructing Mr. Njoku to email Ms. Goff, rather than speaking to her in person, when he wanted to discuss personal matters. Dkt. 53-19. BOKF's approach of discussing the issue with both parties and following up afterward was tailored to the number, nature and severity of the incidents reported to it. *See Adler*, 144 F.3d at 677 (concluding that an initial decision to counsel the offending employee was reasonable in response to the first reported incident, as the defendant "would not know what degree of discipline would be severe enough to deter" the misconduct).

Ms. Goff argues that BOKF's response was not proportionate because Ms. Pratt admonished her not to be so easily offended and instructed her to interact more closely with Mr. Njoku. Dkt. 63 at 6. Although the Court credits Ms. Goff's evidence on this point, it does not share her opinion that the statements made to Ms. Goff rendered BOKF's response disproportionate. The Court is mindful of the evidence that both Mr. Njoku and Ms. Goff informed Ms. Pratt about concerns they had with one another. The fact both Ms. Goff and Mr. Njoku were admonished about how to behave going forward does not render BOKF's response concerning Mr. Njoku's behavior unreasonable. *See Bird v. W. Valley City*, 832 F.3d 1188, 1204 (10th Cir. 2016) (concluding that it was reasonable for the employer to investigate both the plaintiff and the person she complained of when the two "had been at each other's throats" and treated each other poorly).

Finally, the Court notes that there is no evidence that BOKF was made aware of any further misconduct by Mr. Njoku until December 27, 2020, when Mr. Njoku (not Ms. Goff) forwarded the December 7 email to his supervisor and requested reassignment to another branch. Dkt. 53-144 at 4-6.

In response, BOKF immediately began scheduling Ms. Goff and Mr. Njoku at different branches when it was possible to do so. Ms. Goff and Mr. Njoku worked together on only two occasions after that date. Dkt. 53 at 23 (statement of fact no. 108); Dkt. 53-144 at 59; Dkt. 63 at 8 (response to statement of fact no. 108). So far as BOKF was aware, its attempts to correct the harassment on October 30, 2020, were effective, and it took steps to limit the contact between Ms. Goff and Mr. Njoku as soon as it was told that the conflict between those employees remained unresolved. *See Adler*, 144 F.3d at 677 (indicating that an employer is obliged to address repeat conduct, and the reasonableness of an employer's response may depend on whether progressive measures are used to address repeated behaviors).

The record as a whole demonstrates that BOKF sought out information from Ms. Goff when it learned of a possible dispute between her and Mr. Njoku in October 2020; immediately investigated and took steps to address Ms. Goff's concerns; directed Mr. Njoku to change his behavior; followed up with Ms. Goff to determine whether she had any additional concerns; and took measures to separate Ms. Goff and Mr. Njoku upon learning that there was continued conflict between them. This evidence, taken together, simply does not support the inference that BOKF failed to take remedial measures that were "reasonably calculated to end" the few instances of harassment that it was made aware of. *Adler*, 144 F.3d at 678. BOKF's motion for summary judgment is therefore granted with respect to Ms. Goff's hostile work environment claim. *Id.* at 673 (declining to address the question of whether a hostile work environment existed when the claim was disposed of "on the absence of employer liability").

V

The Court now turns to Ms. Goff's claim that BOKF illegally fired her in retaliation for her decision to report Mr. Njoku's conduct to management. To prevail on this claim, Ms. Goff must present evidence that, if true, would permit a jury to find that (1) she engaged in activity protected by Title VII,

14

(2) she suffered an adverse employment action after doing so, and (3) a causal connection links the protected activity to the adverse employment action. *See Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1263-64 (10th Cir. 1998). If Ms. Goff can make this showing, it then falls to BOKF to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1227 (10th Cir. 2008). The burden then shifts back to Ms. Goff, who can defeat summary judgment by demonstrating that BOKF's asserted reasons for its decision are pretextual. *Id*.

The Court assumes, for the sake of this opinion, that Ms. Goff has established a prima facie case of retaliation. And Ms. Goff does not challenge BOKF's assertion that it had a legitimate reason for terminating her employment—namely, her "unwillingness to . . . be receptive to coaching efforts" and her "issues building relationships with co-workers." Dkt. 53-1; Dkt. 63. Thus, the only question for the Court to decide is whether Ms. Goff has demonstrated BOKF's stated reasons for its decision are pretextual.

A plaintiff demonstrates pretext by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (citation and quotation marks omitted). When evaluating whether a plaintiff has established pretext, the court must "examine the facts as they appear to the person making the decision" challenged by the plaintiff. *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1261 (10th Cir. 2001) (citation and quotation marks omitted). The court must not second-guess the wisdom of the employer's decision but should instead ask "whether the reason articulated by the employer was the real reason for the challenged action." *Id*.

Case No. 22-cv-365

Ms. Goff sets forth four categories of evidence that, she claims, demonstrate BOKF's stated grounds for termination are pretextual: First, she notes that even though both she and Mr. Njoku were subjects of the investigation, BOKF never took any adverse action against Mr. Njoku. Dkt. 63 at 30. But the fact that BOKF did not discipline Mr. Njoku does little to prove or disprove BOKF's claim that it had a legitimate reason to fire Ms. Goff. There is no evidence that BOKF subjectively believed that Mr. Njoku engaged in conduct that was as serious as Ms. Goff's yet treated him differently. Nor is there evidence that BOKF was concerned that Mr. Njoku's behavior, like Ms. Goff's, was "continuing to escalate" and might "result in the loss of some good employees" if left unaddressed. Dkt. 53-138. *Cf. Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) (indicating that a plaintiff can establish pretext by "providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness"). Absent such evidence, the fact that Mr. Njoku was never disciplined for the few incidents that BOKF had been informed of cannot establish pretext.[10]

Second, Ms. Goff suggests that the timing of her termination is suspicious, as her supervisors were made aware of the December 7, 2020 email only six weeks before they elected to terminate her. Dkt. 63 at 30. But "even though the timing leading up to an employee's termination is evidence of pretext, it is not sufficient standing alone to establish pretext." *Bird*, 832 F.3d at 1204 (emphasis and citations omitted). The fact that Ms. Goff was terminated relatively soon after her supervisors became aware of her email to Mr. Njoku and its contents is insufficient to demonstrate that BOKF's stated reasons for

---

[10] Ms. Goff cites to *Bekkem v. Wilkie*, 915 F.3d 1258, 1274 (10th Cir. 2019), in support of her claims, but *Bekkem* is inapposite. The employer in that case reprimanded the plaintiff and mentioned the plaintiff's allegations of discrimination in the reprimand itself. The court of appeals found, based on that evidence, that a jury could link the reprimand to the allegations referenced therein. *Id.*

Case No. 22-cv-365

its decision are false. *Id.* (affirming summary judgment where the plaintiff was fired less than one month after complaining about misconduct where there were no other convincing arguments that the employer's reasons for its decision were unworthy of belief).

Third, Ms. Goff takes issue with BOKF's consideration of her correspondence with Iby Dick when making its decision, even though she was never informed that her communication with Mr. Dick was inappropriate. But Ms. Goff does not point to any case law suggesting that this evidence tends to cast doubt on BOKF's stated reasons for firing her or renders them unworthy of credence. Plaintiff was fired for her failure to accept coaching and her inability to build relationships with co-workers; the fact that BOKF did not inform Ms. Goff of each and every instance in which she demonstrated an inability to accept correction or build meaningful relationships does not demonstrate that BOKF's stated reason for its decision was weak, implausible, or contradicted by the evidence—particularly given the ample evidence demonstrating the manner in which Ms. Goff communicated with her co-workers. *E.g.,* Dkts. 53-20; 53-24; 53-27; 53-28; 53-134; 53-136.

Finally, Ms. Goff asserts that pretext can be established by the allegedly inconsistent answers given by Ms. Bryant, Ms. Weil, and Ms. Tate regarding the person responsible for firing her.[11] Dkt. 63 at 30. Although inconsistencies in an employer's stated reasons for its decision can support a

---

[11] Ms. Goff also takes issue with alleged evasiveness in Ms. Bryant's deposition. Dkt. 63 at 14, 30. The Court has reviewed the portions of Ms. Bryant's transcript referenced by Ms. Goff. In her deposition, Ms. Bryant testified that BOKF learned about many of Mr. Njoku's alleged acts of harassment during Ms. Goff's deposition, and she stated she would consider the pattern of behavior described during the deposition to be "inappropriate." Dkt. 63-1 at 19; *id.* at 1-19. Ms. Bryant was reluctant to state that the facts recited to her—and other hypothetical situations—would violate BOKFs policies and procedures. *Id.* at 19-24. But she did ultimately say that the allegations, if substantiated by an investigation, would violate BOKF's anti-harassment policy. *Id.* at 24. The testimony about what BOKF might have found if actions by Mr. Njoku were reported, investigated, and substantiated does not establish that BOKF's reasons for terminating a different employee were pretextual.

Case No. 22-cv-365

finding of pretext, *see Morgan*, 108 F.3d at 1323, Ms. Goff has not presented any evidence of inconsistencies in this case: Both Ms. Weil and Ms. Bryant have uniformly testified that Ms. Bryant was responsible for the decision to terminate Ms. Goff's employment. *See* Dkt. 63-1 at 28 (acknowledging that Ms. Bryant made the decision to terminate Ms. Goff's employment); Dkt. 63-3 at 2 (testimony by Ms. Weil that she did not participate in the decision and was "made aware" by Ms. Bryant).[12] This evidence does not establish pretext.

The evidence and arguments relied upon by Ms. Goff, whether taken together or separately, fail to create a triable question of fact as to whether BOKF's stated reasons for terminating Ms. Goff's employment are unworthy of credence. Accordingly, BOKF is entitled to summary judgment on Ms. Goff's retaliation claim.

VI

Ms. Goff failed to present evidence that, if accepted, would permit a jury to find that BOKF negligently failed to address the hostile work environment allegedly created by Mr. Njoku's conduct. She likewise failed to present evidence sufficient to permit a jury to find that BOKF's stated reasons for firing her were pretextual. Accordingly, BOKF's motion for summary judgment on Ms. Goff's federal claims [Dkt. 53] is granted.

---

[12] Ms. Goff argues that Ms. Tate's testimony and BOKF's discovery responses are inconsistent with this testimony, and she cites two statements of fact in support of this claim. *See* Dkt. 63 at 30 (referring to additional statements of fact nos. PF29 & PF 34). But PF29 does not concern the identity of the person who decided to fire Ms. Goff. Although PF34 addresses that issue, the evidence cited in support of PF34 does not establish any inconsistency. *Compare* Dkt. 63 at 15 (citing pages 8-10 of Ms. Tate's deposition, attached as exhibit 5, and BOKF's response to interrogatory no. 2, attached at exhibit 6), *with* Dkt. 63-5 at 2-4 (discussing corporate designees at the identified pages) *and* Dkt. 63-6 (setting forth responses to requests for admission, rather than responses to interrogatories).

Case No. 22-cv-365

DATED this 31st day of March 2025.

_____
JOHN D. RUSSELL
*United States District Judge*